IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal Action No. 3:23cr122 (RCY) |
| ) | |
| DENNIS ZELEDON HERNANDEZ, ) | |
|     Defendant. ) | |
| ) | |

## MEMORANDUM OPINION

This matter is before the Court on Defendant Dennis Zeledon Hernandez's ("the Defendant" or "Mr. Zeledon")[1] "Proffer and Request for Duress / Necessity Instruction," ECF No. 43, asking the Court to instruct the jury on the affirmative defense of duress.[2] For the reasons stated below, the Court will deny Mr. Zeledon's request.

### I. BACKGROUND[3]

**A. The Defendant's Immigration Proceedings, Escape,[4] and Federal Prosecution**

Mr. Zeledon is from El Salvador. His experience with the United States immigration system began in July 2016, when Immigration and Customs Enforcement ("ICE") officials

---

[1] The Indictment in this case lists the Defendant's name as "Dennis Zeledon Hernandez." But the parties' recent filings list the Defendant's first name as "Denis," not "Dennis." And immigration documents attached to the Government's response brief list his maternal surname as "Hernandes," not "Hernandez." When referring to the Defendant by name, in accordance with naming customs, the Court will use the Defendant's paternal surname (the spelling of which is uncontested), "Zeledon."

[2] The parties here use, as have courts on occasion, terms like "duress," "necessity," "coercion," and "justification" interchangeably. *See generally* Def.'s Proffer and Req. for Duress / Necessity Instr.; Gov't's Resp., ECF No. 44; *United States v. Gore*, 592 F.3d 489, 491 n.* (4th Cir. 2010); *United States v. Butler*, 485 F.3d 569, 572 n.1 (10th Cir. 2007). The parties primarily use the term "duress," both meaning the same thing and agreeing on the applicable legal standard, so, for simplicity's sake, the Court uses the term "duress" in this opinion.

[3] This background is drawn from the sworn testimony at the March 27, 2024 motions hearing and/or the parties' briefs or documentary evidence on this issue, as cited. All page numbers referring to documents in the record refer to such documents' page numbers as provided by CM/ECF, and not necessarily to the documents' internal numbering.

[4] The Court uses the term "escape" throughout this opinion because counsel for the Defendant has represented that there is no dispute that there was an escape—the only issue is the availability of the duress defense on these facts.

encountered him at the southern border, in Texas. *See* Gov't's Resp. Ex. 1, ECF No. 44-1 ("Notice to Appear"). At that time, Mr. Zeledon claimed fear of returning to El Salvador, and an asylum officer found that he had preliminarily demonstrated a credible fear of persecution in his home country. *Id.* ICE officials personally served Mr. Zeledon with a Notice to Appear for his asylum hearing before an immigration judge, and he was ultimately released on bond on September 13, 2016. *See* Def.'s Proffer and Req. for Duress / Necessity Instr. 1–2, ECF No. 43 ("Def.'s Instr. Req."); *see also* Notice to Appear; Gov't's Resp. Ex. 2, ECF No. 44-2 ("Bond Order and Notice"). Both the Notice to Appear and the Bond Order and Notice warned Mr. Zeledon to maintain an updated mailing address with the Department of Homeland Security ("DHS"). *See* Notice to Appear; Bond Order and Notice. Both documents included notices that, if Mr. Zeledon failed to appear at his asylum hearing, the presiding immigration judge could order Mr. Zeledon removed *in absentia*. *See* Notice to Appear 2; Bond Order and Notice 1.

On October 13, 2016, Mr. Zeledon filed a motion for change of venue with the Immigration Court asking that his proceedings be transferred to Virginia. *See* Gov't's Resp. Ex. 3, ECF No. 44-3. His case was transferred to Virginia. *E.g.*, Def.'s Instr. Req. 2. On October 27, 2017, Mr. Zeledon submitted a change of address form informing the Immigration Court that he had changed his address from Jan Rae Circle in Williamsburg, Virginia, to Merrimac Trail in Williamsburg, Virginia. *See* Motion for Change of Venue; Gov't's Resp. Ex. 4, ECF No. 44-4. In May 2018, the Immigration Court sent a Notice of Hearing by mail to Mr. Zeledon's Merrimac Trail address, which served to notify Mr. Zeledon of his master hearing in Immigration Court on December 9, 2019, in Arlington, Virginia. *See* Gov't's Resp. Ex. 5, ECF No. 44-5. Mr. Zeledon testified that he did not receive this notice, but he testified that he actually found out that the hearing was to occur because he called immigration authorities and got that information.

Despite knowing about the hearing, Mr. Zeledon failed to appear at the December 9, 2019 hearing, and the Immigration Court ordered Mr. Zeledon removed *in absentia*. *See* Gov't's Resp. Ex. 6, ECF No. 44-6 ("Removal Order"). At no point between December 2019 and May 2023 did Mr. Zeledon seek relief from, or contact, the Immigration Court or ICE. Gov't's Resp. 2; *see* Def.'s Instr. Req. 2.

On May 14, 2023, Mr. Zeledon was arrested in York, Virginia on state charges for driving under the influence, carrying a concealed weapon, and child neglect. Gov't's Resp. 2; *see* Def.'s Instr. Req. 2. ICE officials received notice Mr. Zeledon had been arrested on state charges and issued a Warrant of Removal pursuant to the 2019 Removal Order, resulting in the Defendant's transfer to Caroline Detention Facility in Bowling Green, Virginia under ICE custody on May 17, 2023. Gov't's Resp. 2.

ICE scheduled Mr. Zeledon to be transferred from Caroline Detention Facility to an ICE staging facility in Alexandria, Louisiana on May 23, 2023.[5] *See* Gov't's Resp. Ex. 7, ECF No. 44-7 ("Zeledon Removal Schedule"). Mr. Zeledon retained an immigration attorney, and on May 23, 2023, the attorney contacted ICE officials requesting they stay Mr. Zeledon's transfer to Alexandria, Louisiana, because he planned to seek emergency relief from the Immigration Court on Mr. Zeledon's behalf. *See* Gov't's Resp. Ex. 8, ECF No. 44-8. ICE officials agreed to delay Mr. Zeledon's transfer as a courtesy. Gov't's Resp. 3. By the morning of May 30, 2023, Mr. Zeledon's attorney had not yet filed his emergency motion, so ICE officials transferred Mr. Zeledon from Caroline Detention Facility to Alexandria, Louisiana by plane. *Id.* Later that day, however, Mr. Zeledon's attorney filed an "Emergency Motion to Rescind in Absentia Removal Order and Reopen Removal Proceedings Based on Lack of Notice" on May 30, 2023, arguing that

---

[5] The Government represents that ICE detainees scheduled for removal to El Salvador are typically sent to Alexandria, Louisiana for several days before their final deportation. Gov't's Resp. 3.

the removal order was defective because Mr. Zeledon did not receive proper notice of his master hearing. *See* Gov't's Resp. Ex. 9, ECF No. 44-9 ("Motion to Reopen"). ICE officials then transferred Mr. Zeledon back to Caroline Detention Facility, where he arrived on June 6, 2023, while his Motion to Reopen was pending. Gov't's Resp. 3.

The Immigration Court denied Mr. Zeledon's Motion to Reopen on June 13, 2023. *See* Gov't's Resp. Ex. 10, ECF No. 44-10. Mr. Zeledon had 30 days to appeal the denial of his Motion to Reopen to the Board of Immigration Appeals ("BIA"), *see* 8 C.F.R. § 1003.38(b), giving him until July 13, 2023, to appeal. ICE officials then scheduled Mr. Zeledon to be transferred to Alexandria, Louisiana on July 3, 2023, where he would stay until his planned removal to El Salvador on July 12, 2023. *See* Zeledon Removal Schedule. Mr. Zeledon never appealed the Immigration Court's denial of his Motion to Reopen to the BIA. Nor did he file anything else with the BIA or with any judicial body to try to stop his removal.

Instead, on July 2, 2023, the day before he was to be transferred to Alexandria, Louisiana, Mr. Zeledon escaped from Caroline Detention Facility. Mr. Zeledon was on his way to a medical appointment when he darted across a field inside the facility, scaled a fence using sheets he had tied to serve as a rope, and ran away into the woods. Mr. Zeledon stated that he did not know in which direction he was going, just that he was getting away from the detention facility.

Mr. Zeledon testified that he walked for two or three days before he reached a city, ending up in North Carolina. He made it to a restaurant where he saw a man and a woman in their car in the parking lot. Mr. Zeledon asked the man if he spoke Spanish; the man said yes. Mr. Zeledon asked to use the man's phone, and the man obliged. Mr. Zeledon learned that he was in North Carolina because he asked the man in the car where they were. With the man's phone, Mr. Zeledon called a friend of his in North Carolina and asked the friend to come pick him up. After four hours, the friend arrived. Mr. Zeledon and the friend drove to the friend's house in Durham County,

around 200 miles away from Caroline Detention Facility. *See* Gov't's Resp. 4. Mr. Zeledon stayed there for three or four days before he was arrested by law enforcement.

On September 30, 2023, a federal grand jury issued an indictment charging Mr. Zeledon with two counts: Count I, obstruction of agency proceedings, in violation of 18 U.S.C. § 1505; and Count II, escape, in violation of 18 U.S.C. § 751(a). Indictment, ECF No. 15. The Court denied Mr. Zeledon's Motion to Dismiss Count I on January 2, 2024, *see* ECF Nos. 37, 38.

On February 7, 2024, Mr. Zeledon filed the instant "Proffer and Request for Duress / Necessity Instruction," ECF No. 43, a "Proffer for Denis Zeledon-Hernandez," ECF No. 43-2 ("Proffer"), and a "Declaration of Michael A. Paarlberg," Mr. Zeledon's proposed expert witness, ECF No. 43-1. The Government filed its Response in opposition to the Defendant's request for the duress instruction on February 14, 2024, *see* ECF No. 44. The Defendant filed his Reply in support on March 4, 2024, *see* ECF No. 46. The Court held a hearing on Mr. Zeledon's request on March 27, 2024, where both he and Dr. Paarlberg testified to the following in support of his desired duress instruction.

**B. The Defendant's Evidence in Support of Proposed Duress Instruction**

Mr. Zeledon testified that he is fearful of returning to El Salvador due to his past membership in a gang and a tattoo on his arm indicating membership in the gang. He stated that he believes he would not last more than two days in El Salvador and would be murdered.

Mr. Zeledon was born in 1997. Mr. Zeledon testified that he was recruited to join the gang in El Salvador when he was 16[6] and got the tattoo when he was 17 (per Mr. Zeledon, this was in about 2014). When he was 18 (so, circa 2015–16), he was asked by a higher-up in the gang to kill

---

[6] Mr. Zeledon's Proffer included a representation that he was recruited under threat into the gang. Proffer ¶ 2 ("At around age 16, gang members began making him transport contraband . . . . They threatened him and his family with violence in order to make him comply."). Mr. Zeledon did not testify to that at the hearing. He also stated that he had never seen the Proffer.

5

somebody. He responded "yes" (fearing that if he said "no" they would kill him), was given a weapon, but then threw it away and left his home. He began living at relatives' houses, first his grandmother's and then his aunt's. While at his aunt's, he was told by his mother that gang members had been looking for him.[7] Mr. Zeledon took his mother's report of gang members looking for him to mean they were looking for him to kill him, so he decided to go to the United States. He then burned off his tattoo; scarring is visible, however, and it is apparent that there used to be a tattoo there.

Mr. Zeledon testified that his first attempt to come to the United States was unsuccessful. He stated that he was caught in Querétaro, Mexico and was deported back to El Salvador. He stayed in El Salvador for two days without incident and then set off toward the United States again. He made it to the United States in 2016.

Fast forward over six years to Mr. Zeledon's time in DHS and ICE custody. Mr. Zeledon testified that when he heard he was subject to a removal order, he hired an immigration attorney. He communicated to his attorney primarily through his cousin and wife, but one time the attorney spoke to him in person and the two communicated via a translator. He testified that the first time DHS and ICE tried to deport him, they sent him to Louisiana, but he was sent back to the Caroline Detention Facility in Virginia. Mr. Zeledon stated that his lawyer filed a petition to stop the deportation (the Motion to Reopen), but that petition was denied. Mr. Zeledon said that the last thing he heard from his attorney was that the attorney could not do anything else for Mr. Zeledon and that it would be better if he was just deported to El Salvador.

Mr. Zeledon stated that he escaped Caroline Detention Facility on July 2, 2023, because he believed he was going to be sent back to his country the next day. He said that he learned of his

---

[7] Mr. Zeledon's Proffer also included a representation that those gang members threatened his mother. Proffer ¶ 4 ("While at his aunt's, he learned that gang members had been to his mother's house looking for him and threatened his mother."). Mr. Zeledon did not mention that in his testimony at the hearing.

6

scheduled flight out of Caroline Detention Facility because he had checked out a book, which he would typically be allowed to keep for three days, but someone told him that he was going to be deported and sent back to his country. In response to learning this information, Mr. Zeledon called his cousin to confirm that he had a flight out of Caroline Detention Facility the next day, and his cousin so confirmed.

Mr. Zeledon testified that if he was sent back to El Salvador, he believes that he would be put in jail. He stated that inside or outside of jail, he believed he would not last more than two days. He fears harm in El Salvador because he did not follow gang orders and instead left the gang. He testified that the punishment for leaving the gang is getting murdered or punishing the person who leaves by punishing their family. And he still has the remnants of a tattoo indicating membership in that gang.

Mr. Zeledon also adduced the testimony of Dr. Michael Paarlberg, a professor at Virginia Commonwealth University and an expert on crime, immigration, and gangs in El Salvador. Dr. Paarlberg stated that he has served as an expert witness in immigration courts, has advised congressional offices, and has given testimony to the United States House Foreign Relations Committee. Dr. Paarlberg testified generally about the political situation in El Salvador and the practices of gangs there. Dr. Paarlberg testified about the State of Exception currently in effect in El Salvador. He stated that for a little over a year, the El Salvadoran government has suspended civil liberties and is holding 75,000 people, most without charge, indefinitely in prisons. He stated that police are ordered to meet arrest quotas, and that the police target those who fit the profile of gang members or former gang members, including those with tattoos. Dr. Paarlberg stated that Mr. Zeledon fits the profile of a person police are under mandate to arrest, and police would likely conclude he is a former gang member.

If Mr. Zeledon were put in prison, Dr. Paarlberg stated that Mr. Zeledon would be scrutinized, first by police (who would want to know the nature of his removed tattoo) and then by other detainees, who would interrogate Mr. Zeledon about his gang affiliation. Dr. Paarlberg stated that it is likely Mr. Zeledon would be housed with members of his former gang and/or with members of the rival gang. Dr. Paarlberg testified that if it were discovered by members of Mr. Zeledon's former gang that he was a former member who left without permission, he would be punished in some, likely violent, way. Per Dr. Paarlberg, that punishment could range anywhere from a severe beating to death, with the level of punishment varying depending on the severity of the infraction. He also testified that it is not certain that someone who leaves Mr. Zeledon's gang is punished—in rare instances, members can leave the gang, including through some sort of partnership that the gangs have with churches in El Salvador.

## II. LEGAL STANDARD

"A defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." *United States v. Ricks*, 573 F.3d 198, 200 (4th Cir. 2009) (alteration omitted) (quoting *Mathews v. United States*, 485 U.S. 58, 63 (1988)). Duress is one such recognized defense. "The duress defense is limited to very narrow circumstances . . . ." *United States v. King*, 879 F.2d 137, 138 (4th Cir. 1989). To establish duress, the burden is on the defendant to produce evidence which would allow the factfinder to reasonably conclude each of the following elements: (1) that the defendant faced a present or an imminent threat of death or serious bodily injury; (2) that the defendant did not recklessly place himself in a situation where he would be forced to engage in criminal conduct; (3) that the defendant had no reasonable legal alternative (to both the criminal act and the avoidance of the threatened harm); and (4) that a direct causal relationship linked the crime action and the avoidance of the threatened harm. *United States v. Crittendon*, 883 F.2d 326, 330 (4th Cir. 1989); *United States v. Simo*, 68 F.

Supp. 2d 706, 710 (E.D. Va. 1999). "[W]here there is insufficient evidence, as a matter of law, to support an element of the affirmative defense, the defendant can be precluded from presenting any evidence of duress to the jury . . . ." *United States v. Sarno*, 24 F.3d 618, 621 (4th Cir. 1994).

### III. DISCUSSION

The Court will deny the Defendant's request for a duress instruction because he has not made the requisite evidentiary showing on each element of his proposed duress defense. The Defendant has not adduced sufficient evidence as to the first element: that he was under an imminent and specific threat of harm when he escaped from Caroline Detention Facility on July 2, 2023. Nor has he provided enough evidence on the third: that, to avoid his feared harm, he had no reasonable legal alternative to escaping. Because a reasonable jury could not find for him on each element of the defense, the Court will deny the Defendant's request for a duress instruction.[8]

### A. Element 1 — Imminent Threat of Harm

A defendant seeking to put on a duress defense must adduce evidence to support a conclusion that the defendant "was under a present or imminent threat of death or injury." *United States v. Crittendon*, 883 F.2d 326, 330 (4th Cir. 1989). It is well-settled that "generalized fears will not support the defense" of duress. *Id.* (citing *United States v. Harper*, 802 F.2d 115 (5th Cir. 1986)). "Instead, the defendant must show that a real and specific threat existed at the time" he committed the criminal offense. *Id.* As the Ninth Circuit has colorfully put it, to satisfy this element, the threat must be "such that the defendant's persecutors 'figuratively held a gun to his head' (or to his family's heads) compelling the defendant to commit the illegal action." *United States v. Vasquez-Landaver*, 527 F.3d 798, 802 (9th Cir. 2008) (quoting *United States v. Shryock*,

---

[8] Because the Defendant has not made a sufficient evidentiary showing on either the first or third elements, the Court need not consider whether the Defendant has satisfied his burden on the second or fourth elements.

342 F.3d 948, 988 (9th Cir. 2003)); *cf. United States v. Mooney*, 497 F.3d 397, 406 (4th Cir. 2007) (defendant who had gun pointed at his head "was under an imminent and specific threat of death").

The facts of *Crittendon* help define the contours of the "real and specific threat" aspect of imminence. The defendant in *Crittendon* was charged with the unlawful possession of a firearm by a convicted felon, and he argued that he should be permitted to put on a duress defense to that charge. 883 F.2d at 327, 329. Eight months before his arrest on the gun charge, the defendant was shot while returning home late one evening. *Id.* at 329. Prior to his shooting, the defendant's wife had received several death threats over the telephone. *Id.* The defendant testified that he possessed the gun solely to protect himself against the possibility of another shooting. *Id.* The Fourth Circuit concluded that the defendant was not entitled to the duress defense, and it affirmed the district court's refusal to instruct the jury on the defense. *Id.* at 329–30. The Fourth Circuit explained that "[w]hile his fear of another attack may have been rational and might have been his real motivation for carrying a revolver," the defendant's evidence showed only a generalized fear of harm, not any real or specific threat, which was insufficient as a matter of law to permit a reasonable jury to find for him on the first element of the defense. *Id.* at 330.

In this case, the Defendant's evidence does not demonstrate a threat any more specific than that deemed insufficient in *Crittendon*. The Defendant testified that, some seven years before his escape from Caroline Detention Facility, his mother told him that some unidentified gang members were at his mother's house looking for him, which he understood as them looking for him to kill him. Outside of that, there is no evidence of any threat of harm made against the Defendant by any gang member for his decision to leave the gang. And the Defendant never actually testified that any gang member ever levied a personal, in-person threat against him. In fact, after learning that those unnamed gang members had been looking for him, the Defendant was forced to return

10

to El Salvador, where he remained for two days and reported no issues.[9]  There was no renewed or specific threat against him during those two days, nor has there been in the seven years since.  The Defendant's personal understanding of how gangs generally might punish those who leave is not an example of a specific, imminent threat of harm against him.  And the Defendant's academic evidence is likewise non-specific, showing only general risks that may or may not materialize for any current or former gang members (or those fitting that profile) in El Salvador.  All told, the Defendant's evidence shows merely a generalized fear of gang members in El Salvador.  Although this fear may be entirely rational and may be the Defendant's real reason for escaping from Caroline Detention Facility, unfortunately for the Defendant, this generalized fear of harm in El Salvador is not enough on this element to present the question of duress to the jury.

This Court is not the first to conclude that the sort of evidence and fear the Defendant forwards are insufficient on this element and thus insufficient to sustain a duress defense.[10]  The Eighth Circuit rebuffed a proposed duress instruction where a defendant (charged with illegal reentry) testified that he faced danger in El Salvador from the government and gang members because of his tattoos indicating membership in a gang.  *United States v. Bonilla-Siciliano*, 643 F.3d 589, 590–91 (8th Cir. 2011).  That defendant adduced evidence tending to show that former and current gang members in El Salvador were likely to be taken into custody simply for having tattoos and that he had attempted to remove his tattoos but could not successfully do so because of problems with his skin, so his tattoos remained.  *Id.*  The Eighth Circuit summarily concluded that the defendant "did not make a *prima facie* showing on the first element" of duress because he

---

[9] The Court notes that this contradicts the Defendant's presently professed fear of being killed within two days of being back in El Salvador.  Still, the Court takes his testimony at face value at this procedural posture.

[10] As one scholar has observed, "federal courts have not been kind to these arguments.  Almost without exception, they have concluded that the harms refugees fear are not sufficiently 'imminent' to qualify for common law necessity or duress defenses." Evan J. Criddle, *The Case Against Prosecuting Refugees*, 115 Nw. U. L. Rev. 717, 743 (2020).

"failed to identify any specific threat to his safety, and relied only on a generalized fear of harm from the government and gang members . . . ." *Id.* at 591.

A district court in the Southern District of Texas did the same on facts that the undersigned views as slightly stronger for a defendant than those here. *See United States v. Brizuela*, 2014 WL 2257405 (S.D. Tex. May 29, 2014). In that case, the defendant (charged with illegal reentry) submitted evidence focusing on his fear of bodily harm and death due to his prior membership in an El Salvadoran gang. *Id.* at *1. The defendant moved from El Salvador to California, joined the El Salvadoran gang in California, subsequently left the gang and moved to Texas, and then was deported to El Salvador. *Id.* The defendant testified that, back in El Salvador, he did not feel safe due to his past gang membership and tattoos. *Id.* He further testified that in El Salvador, two weeks before deciding to return to the United States—and less than a month before he committed the acts underlying the criminal charge at issue there—"El Salvadorian gang members attempted to force him into an alley to gather more information about him or possibly kill him." *Id.* Even in the face of that recent run-in with gang members, the district court found the defendant's evidence to amount to nothing more than "testimony that [the defendant] generally feared for his life in El Salvador," insufficient to establish this first element of duress. *Id.* at *2.

For these reasons, the Court cannot say that the Defendant has adduced sufficient evidence to permit a jury to reasonably conclude that he was under an imminent and specific threat of harm at the time of his escape. The Defendant has shown only a generalized fear of harm in El Salvador. The Defendant's failure to make the requisite showing on this essential element is a basis for the Court to deny his request for a duress instruction.

### B. Element 3 — Lack of Reasonable, Legal Alternatives

"Under any definition of th[e duress] defens[e] one principle remains constant: if there was a reasonable, legal alternative to violating the law, 'a chance both to refuse to do the criminal

12

act and also to avoid the threatened harm,' the defens[e] will fail." *United States v. Bailey*, 444 U.S. 394, 410 (1980) (quoting W. LaFave & A. Scott, Handbook on Criminal Law 379 (1972)). On this element, a defendant bears the burden to "poin[t] to . . . evidence showing that [he] had no legal alternative but to" commit the crime when he did, including availing himself of reasonable alternatives and "investigat[ing] other alternatives" before resorting to the crime. *United States v. Simo*, 68 F. Supp. 2d 706, 711 (E.D. Va. 1999) (citing *Crittendon*, 883 F.2d at 330); *see also United States v. Holt*, 79 F.3d 14, 17 (4th Cir. 1996) (citing *Harper*, 802 F.2d at 118) (defendant must show why "alternatives were ineffectual"—i.e., that the defendant actually tried the alternatives or actually had no time to try them, or that a history of futile attempts revealed the illusory benefits of the alternatives). Whether a defendant had a reasonable legal alternative is an objective inquiry; the defendant's subjective belief as to available legal alternatives is not determinative. *United States v. Dixon*, 901 F.3d 1170, 1181 (10th Cir. 2018); *United States v. Posada-Rios*, 158 F.3d 832, 874 (5th Cir. 1998); *see also United States v. Moylan*, 417 F.2d 1002, 1008–09 (4th Cir. 1969) ("[E]xercise of a moral judgment based upon individual standards does not carry with it legal justification or immunity from punishment for breach of the law . . . . Toleration of such conduct would [be] inevitably anarchic."). So the question is whether the defendant's particular situation objectively permitted a selection from multiple solutions, at least one of which does not involve criminal acts. *Posada-Rios*, 158 F.3d at 874; *United States v. Meraz-Valeta*, 26 F.3d 992, 995 (10th Cir. 1994), *overruled on other grounds by United States v. Aguirre-Tello*, 353 F.3d 1199 (10th Cir. 2004).

Applying these principles here, the Court concludes that the Defendant has not made a sufficient showing that he was without any reasonable legal alternatives to violating the law. For example, the Defendant could have appealed his Motion to Reopen to the BIA and sought a discretionary stay of his removal, *see* 8 C.F.R. § 1003.2(f); U.S. Department of Justice, Executive

13

Office for Immigration Review, Board of Immigration Appeals Practice Manual § 6.3 (Nov. 14, 2022), https://www.justice.gov/eoir/book/file/1528926/download [https://perma.cc/UBD8-5VCJ] [hereinafter BIA Practice Manual], and sought review from the Fourth Circuit, including review "of constitutional claims or questions of law," and requested a stay of removal, *see, e.g.*, 8 U.S.C. § 1252(a)(2)(D); *Gonzalez Galvan v. Garland*, 6 F.4th 552, 556 n.1, 558 (4th Cir. 2021). In cases where defendants are charged criminally for preventing their removal from the United States, seeking relief through the normal administrative adjudicative hierarchy and the appropriate court of appeals are reasonable legal alternatives that can preclude a duress instruction. *See, e.g.*, *United States v. Yan Naing*, 820 F.3d 1006, 1011 (8th Cir. 2016) (defendant charged for failing to procure the documents necessary for his departure could have moved the BIA to reconsider or reopen immigration proceedings or petitioned Eighth Circuit for review); *United States v. Ashu*, 447 F. App'x 71, 72 (11th Cir. 2011) (defendant charged with forcibly resisting ICE agents attempting to remove him could have petitioned Eleventh Circuit for review of adverse decisions in immigration proceedings).

      The Defendant has not provided any evidence that he actually pursued these legal alternatives (in fact, he has adduced no evidence that he had any motions pending either in the immigration system or in any court) or that he investigated these alternatives. At oral argument, defense counsel did not contest that these alternatives technically were legal avenues that the Defendant could have taken, but counsel argued that they should not preclude the duress defense because they were not legal avenues *actually available* to the Defendant. Defense counsel argued that these avenues were not actually available because (1) the Defendant would not have had time to try these alternatives at the time he learned he was going to be deported and scheduled to be flown to Louisiana; (2) the Defendant does not speak English; (3) the Defendant's attorney had told him that there was nothing that he could do for the Defendant to avoid deportation; and

(4) the Defendant had no actual, subjective knowledge of these alternatives. These arguments do not persuade the Court that the Defendant has met his burden to establish the unavailability of these legal alternatives to his escape. Again, the law puts the burden on a defendant to try or "investigat[e] other alternatives" before resorting to criminal acts. *See Simo*, 68 F. Supp. 2d at 711.

As for timing, the Court is not convinced that the Defendant has the correct time frame. The Defendant assesses alternatives as of the day he learned of his scheduled removal, which he testified was July 2, 2023 (also the day of his escape). But courts considering this element have brought an expansive temporal scope to determining whether administrative or judicial review offered a defendant a reasonable legal alternative when seeking to avoid deportation. *See, e.g.*, *United States v. Ashu*, 2011 WL 13176732, at *5 (N.D. Ga. May 18, 2011) ("Defendant could have tried to avoid the threatened harm—being deported—by pursuing review in the Eleventh Circuit. Defendant has not argued that, *during the eleven years he has been in the United States*, it was not a viable or reasonable legal alternative to petition the Eleventh Circuit for review. Defendant also could have petitioned for a stay of removal proceedings while his appeal was pending." (emphasis added)), *aff'd*, 447 F. App'x 71 (11th Cir. 2011). The Court understands the legal requirement to be that the Defendant "must have [had] no alternative—either *before or* during the event—to avoid violating the law." *United States v. Singleton*, 902 F.2d 471, 473 (6th Cir. 1990) (citing *Bailey*, 444 U.S. at 410; *United States v. Lewis*, 628 F.2d 1276, 1279 (10th Cir. 1980)) (emphasis added). So understood, availability arguments vis-à-vis timing do not appear to cut the Defendant's way. And the Defendant does not cite any cases that support taking his narrow temporal view on the question in these circumstances.[11]

---

[11] The Court independently has located one case where a court seriously grappled with the proper time frame to assess the question and chose to not look too far back in time to find available alternatives under the facts before it, but the logic underpinning the analysis there does not work here. That case, *United States v. Kpomassie*, was one

But assuming *arguendo* that that the Court is constrained to look only at the landscape on July 2, 2023, that does not disprove availability. Take the BIA appeal alternative. On July 2, 2023, the Defendant's appeal window on his Motion to Reopen was still open, *see* 8 C.F.R. § 1003.38(b), as the Defendant himself acknowledges, *see* Def.'s Reply 6, ECF No. 46 ("The time to file an appeal had not expired . . . ."). Because "[t]he mere filing of a motion for a discretionary stay of an order does not prevent the execution of the order," the BIA "categorize[s] stay requests into two categories: emergency and non-emergency." BIA Practice Manual § 6.3(c)(2), (d). The BIA considers a non-emergency request "during the normal course of adjudication," but the BIA "may rule immediately on an 'emergency' stay request." *Id.* § 6.3(c)(2).[12] The BIA will "only consider a stay request to be an emergency" in three situations, most relevant here, when a respondent is "in DHS's physical custody and removal, deportation, or exclusion is imminent." *Id.* § 6.3(c)(2)(A). By his own argument, the Defendant's situation on July 2, 2023, fits this description. Def.'s Reply 3 ("Mr. Zeledon . . . was not out of custody; [and] he has shown . . . that

---

where the defendant was charged with preventing and hampering his departure pursuant to a final order of removal. 323 F. Supp. 2d 894, 896 (W.D. Tenn. 2004). The defendant had been forced onto a plane set to transport him out of the United States to Togo and, fearing political persecution in Togo (having actually suffered it there before), initiated a physical confrontation with DHS officers. *Id.* at 896–97, 900–01. The government argued that the defendant had reasonable legal alternatives because he could have filed other administrative motions or appealed to the Sixth Circuit in the past, but the court rejected that argument because, at the time of the crime, the defendant had motions actively pending with the immigration courts, "thus indicating that he pursued legal alternatives . . . ." *Id.* at 901. In this case, the Defendant had no pending motions of any kind in any forum when he escaped, never having appealed the IJ's denial of his Motion to Reopen. *Cf. United States v. Yan Naing*, 2014 WL 12696875, at *2 (W.D. Mo. Aug. 4, 2014) (citing *United States v. Lomax*, 87 F.3d 959, 962 (8th Cir. 1996)) (distinguishing *Kpomassie* on this element, concluding that the defendant's one attempted appeal of the immigration judge's removal order "constitute[d] only a minimal effort to act within the law" and was insufficient to show a lack of reasonable, legal alternatives to violating the law by failing to depart the United States), *aff'd*, 820 F.3d 1006 (8th Cir. 2016). Another difference between *Kpomassie* and this case is that the *Kpomassie* defendant provided documentary evidence that he had not been given notice of his rights to further appeal, 323 F. Supp. 2d at 901, but the Defendant here has adduced no such evidence. These distinctions lead the Court to conclude that an overly constricted time frame would be improper on these facts. And more generally, these distinctions underscore the Defendant's failure to adequately pursue and investigate legal alternatives here.

[12] A party seeking to designate a stay motion as an emergency request must call the BIA's Emergency Stay Unit ("ESU") phone line and provide certain information. *See id.* The ESU will consider an emergency stay request "only on non-holiday weekdays from 9:00 a.m. to 5:30 p.m." Eastern Time. *Id.*

his removal was imminent . . . .").[13]  On July 2, 2023, the Defendant still had six non-holiday business days before he would be removed, during which he would still be in DHS custody. The other two situations the BIA Practice Manual specifically contemplates as "emergencies" are when "removal . . . is expected to occur *within the next 3 business days*," in turn giving the BIA the ability to "rule immediately on [that] 'emergency' stay request" if filed. BIA Practice Manual § 6.3(c)(2) (emphasis added). So, six non-holiday business days fits well within the sort of timeframe these emergency stay procedures contemplate—objectively enough time to pursue this legal avenue. The Defendant has adduced no evidence to suggest otherwise. The Court's conclusion might be different if, for example, the July 3, 2023 flight was one actually set for El Salvador, but those are not the facts here.

Next, the Defendant's language argument. The Court is sympathetic, but the Court finds no support for this argument in the caselaw. The Defendant's most tactile argument in this vein is one he made in his Reply regarding notice in the context of the immigration judge's disposition of his Motion to Reopen. It is important to note, regarding notice, that the Defendant never argues (let alone presents evidence) that he actually did not receive notice that his Motion to Reopen was denied, nor notice of his right to appeal that denial. The Defendant only argues that he "was not provided *a translation* of the IJ's denial" of his Motion to Reopen and that "no one explained to him *in Spanish* that he had any right to appeal." Def.'s Reply 6 (emphases added). But, again, the Defendant cites no case showing why this renders any legal alternatives unavailable. In fact, at

---

[13] As discussed *supra*, "imminence" is also an issue on the first element of the duress defense—a defendant must show a specific (non-generalized) and imminent (close in time) threat of harm. *See Crittendon*, 883 F.2d at 330. That is the portion of the Defendant's Reply brief cited here. *See* Def.'s Reply 3 (" . . . his removal was imminent, and therefore the unavoidable harm associated with it was imminent."). "Imminent" does not necessarily mean the same thing for duress-element-one purposes and BIA discretionary stay purposes. The BIA Practice Manual does not define "imminent." So by noting that the BIA has "emergency" discretionary stay request procedures for removals it deems "imminent" and explaining that the Defendant has not temporally disproved the availability of seeking this relief on the day of his escape, the Court is in no way saying that the Defendant has shown that his removal—let alone the harm that he feared—was "imminent" in the duress-element-one sense.

17

least one district court (affirmed on appeal) explicitly rejected this line of argument, even when a non-English-speaking defendant was without legal representation. *See United States v. Yan Naing*, 2014 WL 12696875, at *2 (W.D. Mo. Aug. 4, 2014) ("Though Naing was proceeding pro se and did not speak English, he was notified of his right to appeal and had several options available to him by which he could have legally challenged his removal order."), *aff'd*, 820 F.3d 1006 (8th Cir. 2016).

Next, the Defendant has forwarded evidence and argument that his immigration attorney stated, either on June 30, 2023, or July 2, 2023, that the attorney could not do anything else for him.[14] But, again, the Defendant does not point the Court to a case that shows that this *per se* disproves the availability of legal alternatives. And, once again, the caselaw affirmatively points the other way. *See Ashu*, 2011 WL 13176732, at *5 ("Reliance on his attorneys' advice does not change the fact that reasonable, legal alternatives were available."), *aff'd*, 447 F. App'x 71.

Ultimately, the Defendant argues that these legal alternatives were not actually available to him because he did not actually, subjectively, know of them. But it is well-settled that the lack of subjective knowledge of an alternative does not render that alternative unavailable. *See, e.g.*, *United States v. Saldivar-Munoz*, 439 F. App'x 730, 735 (10th Cir. 2011) ("[A] defendant's subjective belief that he has no available legal alternatives is insufficient to submit the question to a jury."); *United States v. Grainger*, 239 F. App'x 188, 191 (6th Cir. 2007) ("[T]he evidence showed that Grainger had another reasonable, legal alternative to [illegally reentering the United States]. . . . Grainger could have reapplied to the Attorney General for permission to reenter the United States . . . . [T]he fact that Grainger claims he was unaware of the opportunity to apply to

---

[14] The Defendant testified that this statement was relayed to him on the day that he escaped, which would be on July 2, 2023. But defense counsel, during argument, referenced recordings propounded in discovery and stated that the Defendant was made aware of the lawyer's statement via his cousin on June 30, 2023. The June 30 date was also what was in the Defendant's Reply. *See* Def.'s Reply 6. In either case, this argument does not enjoy support.

[the] Attorney General for permission to reenter is irrelevant. The defendant's subjective belief as to available legal alternatives is not determinative.").

In sum, the Defendant has not adduced sufficient evidence to permit a reasonable factfinder to find that all of his objectively reasonable legal alternatives to escaping for avoiding his feared harm were foreclosed.[15] For that reason, the Defendant cannot establish the third element of the duress defense. And that is a basis to deny the Defendant's request to instruct the jury on the defense.

## IV. CONCLUSION

For the reasons detailed above, the Defendant's request for a duress instruction will be denied.

An appropriate Order shall issue.

/s/ RCY
Roderick C. Young
United States District Judge

Richmond, Virginia
Date: April 15, 2024

---

[15] The Defendant did not stress it at oral argument, but there is a passing suggestion in the Defendant's Reply that he is excused from pursuing these legal alternatives because they may not have been successful. *See* Def.'s Reply 7 (protesting that the Government would have him merely "file frivolous appeals for the purpose of delay"). But just because the result of an alternative is uncertain does not remove it as a reasonable legal alternative to committing a crime; the question is whether the Defendant has shown that he had no reasonable avenue left to try to avoid committing the crime. *See Ashu*, 2011 WL 13176732, at *5 (holding that the defendant had a reasonable legal alternative available because he "could have *tried* to avoid the threatened harm—being deported—by pursuing review in the Eleventh Circuit" (emphasis added)), *aff'd*, 447 F. App'x 71; *Grainger*, 239 F. App'x at 191 (holding that the defendant had a reasonable, legal alternative to illegally reentering the Unites States because he "could have reapplied to the Attorney General for permission to reenter the United States," even "[t]hough the outcome of any application for reentry is indeed uncertain"). The Defendant has not made that showing.